## J. W. McLaughlin *v.* The State.

1. Murder — Manslaughter — Charge of the Court.— If in a murder case there be evidence which, however inconclusively, tends to prove facts from which the jury may deduce a finding of manslaughter, it is incumbent on the trial court to give the law of manslaughter in charge to the jury; and it should be given affirmatively, directly, and pertinently to the theory of the case indicated by such evidence. Mere negative or abstract propositions are not sufficient. See this case in illustration.

2. Same — Right of Self-Defense.— In a trial for murder the theory of the defense was that the deceased and one F. had conspired to kill the defendant, and were present and co-operating to that end when he killed the deceased in self-defense. There was evidence tending to prove the presence and concerted action of the deceased and F., but whether the defendant knew that fact or was cognizant of a conspiracy to kill him was determinable only from the circumstances surrounding the parties at the time of the killing. *Held,* that the charge to the jury should not have ignored the participancy of F., or have conditioned the defendant's right of self-defense on the hostile demonstrations of the deceased alone, but should have recognized the right of the defendant to kill either the deceased or F. if it reasonably appeared to him that they were then present and acting together to take his life.

3. Murder in the Second Degree — Proof of Malice.— At the defendant's first trial for murder he was convicted in the second degree, and, having obtained a new trial, he objected thereat to all evidence tending to prove that the killing was upon express malice. *Held,* that the objection was properly overruled.

APPEAL from the District Court of Montague. Tried below before the Hon. J. A. CARROLL.

The indictment charged the appellant with the murder of one E. O. Driscoll, on March 15, 1879, by shooting him with a pistol. In June, 1880, the case came to trial and appellant was found guilty of murder in the second degree, and a term of five years in the penitentiary was assessed as his punishment. A new trial, however, was granted him, and at the ensuing December term, 1880, the jury found him guilty as before, and awarded him the same punishment.

David Lenox testified, for the State, that at one time the defendant had been in the employ of the deceased as bar-tender, but the business relations of the two terminated several months before the killing of the latter; that at the time of the severance of the business relations between the parties, or shortly thereafter, hard feelings were developed between them, on account of some vulgar intrusion upon his property attributed by the deceased to the defendant, and with regard to the collection of a sum of money due the deceased by the defendant. At the time of the killing, the witness was in the service of the deceased in the capacity of bar-tender. The deceased occupied as his business quarters a house fronting south, the front room being occupied as a grocery store, and the rear room as a saloon. A ten-pin alley, under the same management, ran the length of the two rooms on the east, with a front entrance on the south. On the night before the killing the defendant entered the deceased's business house with a double-barreled shot-gun in his possession, holding his right hand at the hammer. He was angry and asked where that "d—d red-headed son-of-a-b—h" was? and said that he wanted to "settle with him." The witness told him that the deceased was not in, and asked him to leave. He entered the front

door of the front or south room, looked into the rear or saloon-room; then into the ten-pin alley, and then went off. When the defendant had gone the witness sent the deceased word at his boarding house not to return to the store that night, but at a rather late hour he did return, one Freeland accompanying him. Referring to antecedent occurrences, the witness said that he had frequently known the deceased and the defendant to curse and abuse each other when they were in whiskey. At about 8 or 9 o'clock on the morning preceding the day of the killing, the witness saw the defendant and deceased quarreling in the street between the saloon and the store of one McNatt, which stood east of the deceased's place. He did not hear what they said, but could tell that they were quarreling by cursing and abusing each other. About an hour later on the same day, witness and deceased were standing in the grocery door facing a drug store west, near which, on the sidewalk, the defendant was standing. The deceased patted his rear parts at the defendant, and the witness a few minutes later heard them quarreling across the street. The defendant asked the deceased what he meant by patting his rear at him; this the deceased denied having done. The defendant denounced him as a liar, and the two quarreled, cursing each other until 'Squire Orr came on the scene and commanded the peace, and they desisted.

When the shooting occurred next day, the witness was standing near the door leading from the grocery to the saloon-room. Going back from this door to the saloon counter, the witness noticed the man Freeland near the billiard table, coming apparently from the west door of the saloon-room and going in the direction of the front room. The shooting was then in progress. When the firing was over, witness, in going into the front from the saloon-room, met the deceased at the door between the two. He was staggering and reeling, and witness

laid him on the billiard table in the saloon-room, where, in about one-half hour, he died.

On cross-examination this witness said that himself and deceased had often discussed the various difficulties in which he, witness, and deceased had been engaged, and deceased had often promised to "see him through" any in which he, the witness, should become involved in the future, and had told him that he, the deceased, knew where there was a good place for a hog ranch in the Indian Nation; and that he would furnish witness and his brother, who lived in Red River county, some means, and would send witness his family from Weatherford. In none of these conversations did the deceased say to witness that he would aid him in the manner suggested if he, witness, would kill the defendant, though the deceased may have had such an idea in his mind at the time. Their conversations were of difficulties in general. Some five or six days before the killing, the defendant had a difficulty in the saloon with one Baxter, who had been about Burlington a short time. They both drew knifes, and when, after defendant had finally left, Baxter said that he was "very near killing" the defendant, the deceased said to him, if you had it should not have cost you a cent. Baxter replied that he had money, and displayed a pocket-book containing several hundred dollars. He said he was the son of the governor of Arkansas, and had left trouble behind; "was on the skip." At day-light one morning, two or three days before the killing, witness and deceased were standing together in the saloon when some one came to the side door. The deceased placed himself against the wall to one side from the door, with his hand on his pistol, and told witness to open the door, that "this is as good a chance as I will ever get." The witness declined to do as requested, thinking there would be a difficulty. He told the party to go to the front door, on opening which, he found it to be Jackson White in

quest of whiskey for a case of sickness. On the night before the shooting, when deceased and Freeland came to the saloon, after some talk about the defendant coming to the saloon with the shot-gun, Freeland and deceased looked at their pistols, and took a drink. Deceased asked the witness if he, witness, wanted any stock in this matter? Witness replied that he did not; to which deceased responded: "You are a very good bar-tender, but no account in a fight. Freeland will do." Freeland said: "Yes, by G—d, I am Charley at the wheel; I am on the skip for trouble I left in Tennessee." When the deceased, after being shot, was placed on the billiard table, his pocket book was exposed and Freeland reached and took it, but on request of witness delivered it to him. It was found to contain $95. The killing occurred on Saturday, and Freeland left on the following Monday, and had not been heard of since by the witness. He left his shoe-makers' tools in his shop. The witness told him, Freeland, that he was accused of shooting at the defendant from the alley door, and advised him to leave.

On re-direct examination, the witness testified that, about a week before the killing, the defendant, who was drunk, came into the saloon and got into a quarrel with the deceased; the latter accusing him of having answered a call of nature in the ten-pin alley. The defendant said that he would do that wherever it should please him, even on the counter. The witness had seen the defendant preparing to perform this operation in the alley-way some time before, but prevailed on him to desist.

L. C. McNatt testified, for the State, that at the time of the killing his dry goods store was situated on the northeast corner of the square, in Burlington, and east of the deceased's business house. About sun-down, the evening before the shooting, the deceased came to the witness' store for his mail, and while there was approached by the defendant with the demand: "By God,

why did you put my account in the hands of an officer?" To which the deceased responded, "because I could get no settlement out of you." The defendant replied that the amount was not correct, and that he had been charged with things he did not get. The deceased replied to this by saying that if defendant said he had been charged with things not furnished him, he lied. The defendant said that either deceased or some of his clerks had so charged him. They continued to quarrel and abuse each other until finally witness told them to desist and go to supper. The witness then went into the house, but, going out again very shortly, met the defendant going in the house, but did not see the deceased anywhere about. The witness went to supper, and returning about dark, saw the defendant on the porch at his store, holding a shot-gun down by his side. The witness went into his store and does not know where the defendant went. From witness' porch to the usual pass-way of the deceased, to and from his supper, the distance is about thirty or forty yards.

The witness was in his store next day, when the killing took place, and heard the first shot, after which the firing became rapid, from six to nine shots being fired. After the firing ceased, the defendant ran by the witness' store, and left his pistol on a box in front. There were four barrels freshly discharged.

Cross-examined, this witness stated that he had paid or agreed to pay G. W. Barefoot $25 to assist in securing counsel to aid in the prosecution of the defendant, and had also signed, as security for the heirs of the deceased, a note for $300 for the same purpose. Barefoot was the partner of the deceased, and is now his administrator. The pistol used by the defendant in the killing belonged to Howard Laforce.

Wade Horton testified, for the State, that he was in the employ of the deceased at the time of the killing.

He gave substantially the same account of the quarrels in the street preceding the killing, and of the defendant's coming to the deceased's place of business the night before the killing, armed with a shot-gun and hunting deceased, as that given by Lenox, adding, with reference to this last, that when the defendant left the store that night, he, witness, went to the door and saw that defendant was joined in the street by two other parties, one of whom was a brother of defendant. He testified to nothing as having passed between deceased and Freeland after they came to the store that night, but that he left them and Lenox there. On the next morning, when the killing occurred, witness was in the S. W. corner of the saloon room, near a window from which he could see all that passed in the grocery room. He saw the deceased standing in the front door, and the defendant out on the ground in front, and heard them quarreling. Just as the witness observed them the defendant shot, and immediately the deceased shot. The defendant's first was the fatal shot, the witness observing the dust fly from the back of deceased's coat as the ball passed out.

On cross-examination this witness said that, having called the deceased on business into the store, and away from the quarreling in the street near the drug-store, he advised deceased to have nothing to do with defendant; and that persistent aggravation would result in trouble. Deceased replied that if trouble came he, deceased, would not be in it, but had his man picked, $100 in his pocket, and a good horse in the Indian Nation. The witness then recounted, as Lenox did, the circumstance of the exposure of deceased's pocket book after his death, Freeland's taking it, and on demand returning it to Lenox, adding that Freeland left the country within very few days after the tragedy. He further testified that, on each occasion of the street quarrels of which he and Lenox testified, Freeland occupied positions at defend-

ant's back, but the witness did not see that he had arms about him. On the morning of the killing, the defendant passed the store several times going from McNatt's to Stone's stores; and when deceased would see him, he would shake some chains that hung at the door, and call him "big-bull." The deceased always carried an ivory-handled six-shooter, 45 calibre, pistol. It was empty after the firing, held the six cartridge shells, and was warm.

Henderson Cook, for the State, testified that he was present in the saloon the night before the killing, and corroborated Lenox and Horton entirely as to the defendant's visit to the saloon, armed with a shot-gun, and making inquiries for the deceased, etc.

C. E. Noyes, for the State, after detailing several wordy difficulties between the defendant and the deceased, including those referred to by preceding witnesses, testified that, a short time after leaving the defendant in the drug-store (at which time he also noticed the deceased standing in the saloon door), he saw the defendant standing near the saloon door, with his hand behind him, under his coat; heard him cock a pistol, saw him present the pistol and fire, saw the deceased return the fire immediately; after which he heard several shots. The defendant had on a heavy overcoat, and his pistol was under it.

J. H. Stone testified, for the State, that at the time of the shooting he occupied a position about 30 yards S. W. from the front of the grocery, on horseback, in plain view of both parties. Deceased was standing in his front door. The defendant was standing outside, in front of, and near the deceased. His hat was lying on the ground, 6 or 8 feet S. W. from him. They were quarreling, cursing and taunting each other of fear. They stood thus about five minutes after witness first saw them, when the defendant drew his pistol and dropped it at his side; the deceased at the same time drawing his far enough from his bosom to expose the handle to the witness. The defendant then

put his pistol under his coat, keeping his hand on it, and deceased dropped his back into his bosom, keeping his hand there. The defendant again drew his pistol from behind him, brought it down in front of him with the muzzle directed towards the feet of deceased. The deceased drew his pistol from his bosom until the witness could see nearly the whole of it, and stopped. The defendant then asked, "What do you mean?" The deceased replied: "By G—d, I mean business; what do you mean?" Defendant, raising his pistol, said "if I must, I must," and fired, the deceased firing nearly at the same time. The witness "would not like to say which fired first,— it was so near together." He was certain, however, that the defendant drew and presented his pistol first, though the actions of the parties were nearly simultaneous.

Cross-examined, the witness stated that in his opinion there were altogether some eight or nine shots fired during the fight, but he could not say positively how many. The first two he knew were fired by defendant and deceased. Two shots struck near witness, which in his opinion could not have been fired by either defendant or deceased. A shot fired by the deceased, who stood inside the door, at the defendant, who faced him from the outside, would not have coursed to where these shots struck. Shots fired at defendant from the front of the alley would have had range with the points where these two shots struck.

Jason White, for the defense, testified that very early one morning, two or three days before the killing, he went to the side door of deceased's saloon and tried to get in to purchase some whiskey for a sick child, but was refused admittance there, and directed to go around to the front door. On being admitted there, he found Lenox and deceased. Very early on the morning of the killing, he went to the grocery of deceased to procure some pota-

toes; after purchasing which, he and deceased stood for awhile in the door. During this time the defendant passed by, going towards the drug-store. The deceased hailed him, asking where his shot-gun was,—told him he had best go and get it, and when he got it to use it. Defendant remarked to deceased that he was not armed, and deceased advised him to go and get his arms, and to be sure to use them, adding that it was no more reprehensible to carry a shot-gun during the day than at night. The witness did not think that the defendant would have stopped had he not been hailed by the deceased.

Isaac Beasley, for the defense, testified that he saw a quarrel between defendant and deceased, about dark on the evening before the killing, near McNatt's store, during which defendant asked deceased, "why are you always abusing me when you know I am not armed?" to which deceased replied: "G—d d—n you, go and arm yourself. I will bet you will not do it. I will stay here and wait until you come back and see if you do." The defendant went off towards home, and witness left the deceased standing near McNatt's store, and did not know where he went afterwards.

Cross-examined, the witness said that the shot-gun defendant had on the night before the killing belonged to his, witness', brother. He did not know who gave it to defendant; witness did not. The witness at the time was living in the same house with defendant.

Byron Hill testified for the defense that, at the time of the killing, he was clerking in Stone's drug-store. He heard some quarreling in front of the saloon, and about that time heard Freeland give three or four blasts on his flute and saw him start in a rapid walk across the street from his shoe shop, go in the west door of the saloon, turn as though he were going into the front room of the saloon, and about this time the shooting commenced. Stone, the witness' employer, had a Winchester rifle,

which he had been keeping in the store, but which he had carried home a few days before. Freeland desired witness to keep the gun at the store; and said some "d—n son of a b—h" was going to be killed, and he would have to "skip out." He also told the witness that he should keep the gun in the store, so that if either witness or himself should get into trouble the gun would be "handy," and the two could help each other; that if witness were attacked he, Freeland, could kill the assailant from his shop window. He had told witness that he was on the "skip" from Tennessee on account of trouble. He left the country a few days after the killing, leaving his shop, tools, flute and horse undisposed of, and the witness had heard nothing of him since. Stone's drugstore is across the street from and nearly opposite the west door of deceased's saloon, and Freeland's shoe shop adjoined the drug-store on the north and fronted the same way.

On cross-examination, the witness stated that when the defendant was placed under arrest, he among others was placed in charge of him as guard, and that one night the defendant escaped from them, into the Indian Territory, from where he was brought by Constable Bagley.

J. P. Stone, proprietor of the drug-store, testified for the defense that in the morning, about one hour before the killing, while the defendant was standing in the drugstore door, witness saw the deceased standing across the way in his own door, laughing, dancing, whistling, and patting his rear at the defendant as though to tantalize him, and knew from the defendant's appearance that this conduct angered him. He advised the defendant, however, to have no difficulty with deceased, and received his promise that he would not. Just before the killing he saw the defendant leave the drug-store and go in the direction of McNatt's, and saw that as he, defendant, was about to pass in front of deceased's store, some one rattled

some chains, and reached out and knocked off the defendant's hat. The witness did not see the person who did this. In a short time the shooting commenced. Freeland tried on several occasions to purchase a Winchester rifle from witness, but the latter would not sell, because of the difficulties between defendant and deceased, and he, witness, believed that Freeland was "backing" deceased. Freeland tried also both to borrow and buy a horse from witness, but this he also refused. The witness agreed to sell the gun to Dr. Burns, a partner of deceased, but finding, before the sale was consummated, that he wanted to buy it for Freeland, refused. When Freeland left the country he left on foot.

On cross-examination, the witness stated that on that morning and before the shooting, the defendant told him at the drug-store that he had been drinking and was sick, and witness gave him not more than two drinks of whiskey. He advised defendant to have no trouble with deceased, and he said he would not go about the saloon, and that he would be satisfied if he could give deceased "a good whipping." Defendant lived in Burlington, was in town every day, but was engaged in no business at the time of the killing.

George Cisco, a witness for the defense, testified that while he was standing at a point about 75 steps from the saloon, on the west side of the square, he saw the defendant start from the drug-store in the direction of McNatt's. As he passed the front of deceased's store the latter was standing in the door. After having passed the door, defendant turned with his right hand behind him, and walked up to deceased. The latter struck his hat off with his left hand. Each then struck the other with the left hand. For some time they stood and cursed each other, when the defendant drew his pistol and held it down by his side, and deceased drew his up from his breast pocket, and presently they commenced shooting,

but the witness did not know which shot first. During the shooting witness saw smoke boil out from the alley door, as though some one were shooting from there.

Calvin Baker, for the defense, stated that from a point 75 yards S. W. from the saloon, he saw defendant and deceased, quarreling, the former in front of the saloon with his hand behind him and his hat lying some distance off on the ground, and the latter in the saloon door with his hand in his breast. In a few minutes both drew and commenced firing, but witness could not say which fired first. He saw the defendant's hat, after the shooting, with a hole shot through it. Witness did not think that it could have been shot where it lay by either defendant or deceased.

Rube Horton testified for the defense that, a little after dark on the evening before the killing, he was in McNatt's store, where Pat McLaughlin, defendant's brother, was clerking. Some one told Pat that his brother had gone to the saloon with a shot-gun, and Pat went to the saloon to get his brother to go home. Early next morning witness told the deceased that it would be best to "leave the defendant alone;" that if they kept on it would terminate in trouble. Deceased replied that the row had to come, and had as well come then as any time; that when defendant reached town that morning, he was going to see and ask where his shot-gun was, and tell him to go and get it,— that he would bet $20 the defendant would not get it.

Dr. Salmon testified that he was called to see the defendant shortly after the shooting, and found him shot twice; once in the left side, the ball entering from the front and ranging backwards and downwards very near reaching the cavity of the abdomen; the other ball striking square between the shoulders, passing through the over and under-coats at the seams, and lodging without entering the body, but raising a bump.

*Davis & Garnett*, for the appellant. It is too well settled to require the citation of authorities that the former conviction of murder in the second degree acquitted appellant of murder in the first degree. We first raised the question on the admission of evidence. When the State proposed to travel back for months preceding the homicide and show all the grudges and quarrels that had existed or taken place between the parties, we objected, because such evidence was admissible upon no issue except that of express malice, and that issue had been forever settled against the State; but the objections were overruled.

Upon the former trial the court charged the jury in substance: 1st. That if the homicide was upon preconceived malice it would be murder in the first degree. 2d. If appellant voluntarily entered into mortal combat armed with a deadly weapon, and the design to so enter was formed in his mind when capable of calm, cool and deliberate reflection, the homicide would be murder in the first degree. 3d. That if appellant brought about the difficulty with the intent to kill, the homicide would be murder of the first degree. The jury acquitted appellant of murder in the first degree, and settled all these issues of fact forever against the State. Upon the present trial the court delivers the same charge, submits the same issues, but tells the jury that homicide committed under either of the above three states of fact would be murder in the second degree. If this is not placing a man twice in jeopardy for the same offense, what is it? Suppose that upon the former trial the jury had found the defendant guilty of manslaughter, and thereby acquitted him of both degrees of murder. Suppose that when the defendant was placed upon trial for manslaughter (for he could never afterwards be tried for any higher offense), the court should charge the jury: 1st, that homicide upon express malice is manslaughter; 2d, that if the defendant, armed with a deadly weapon, voluntarily and designedly entered into a mortal

combat, and the design to so enter was formed in his mind when capable of calm, cool and deliberate reflection, that the homicide would be manslaughter; 3d, that if the defendant brought about the difficulty with the intent to kill, the homicide would be manslaughter.  Suppose that the jury, under the charge, should convict the defendant of manslaughter, would a conviction obtained by these foul slanders upon the law be permitted to stand?  If it is error to tell the jury that manslaughter is murder, in order to obtain a wrongful conviction of murder, why should it not be equally erroneous to tell the jury that murder is manslaughter in order to obtain a wrongful conviction of manslaughter?  According to the same rule, why is it not as erroneous to tell the jury that murder in the first degree is murder in the second degree, as it is to tell the jury that murder in the second degree is murder in the first degree?

We are well aware that if the indictment had in the first instance been for murder in the second degree, the defendant would not be permitted to say that the facts would have supported one for murder in the first degree. The State has a right to carve in this way, and a conviction or acquittal would be a bar to any other indictment based upon that transaction.  But in this case the right of the State to carve out of a transaction a lesser offense than was in fact committed, is not the question.  The State did not proceed in that manner, but indicted appellant for murder in the first degree, placed him upon trial, and upon this charge he was acquitted.  The question is as to the right of the State to put the defendant twice in jeopardy for the same offense or upon the same issue. We are also aware of the fact that a defendant will not be heard to complain that the jury and the court erred upon the side of mercy, and convicted him of a lower grade of offense than he was in fact guilty of.  This is not the question involved in this case.  It was not "mercy, drop-

ping as the gentle rain from heaven," that induced these instructions. It looks more like a disposition to deprive appellant of a substantial right by denying him the fruits of his former acquittal, and to twice place him in jeopardy upon the same issues.

In reason and justice, appellant is entitled to the full benefit of the former acquittal of murder in the first degree, and should not be twice placed in jeopardy. And to the end that he should not be deprived of these rights, the evidence should have been confined to the issues arising on murder in the second degree, and the charge should have been confined to murder in the second degree, and should have been a correct exposition of the law of murder in the second degree.

*Grigsby & Willis,* also for the appellant.

*H. Chilton,* Assistant Attorney General, and *N. P. Jackson,* for the State.

Hurt, J. The appellant killed E. O. Driscoll on the 15th day of March, A. D. 1879, in the town of Burlington, Montague county. In June following he was indicted by the grand jury of that county on a charge of murder in the first degree. In June, 1880, he was tried and convicted of murder in the second degree. At the December term, 1880, a new trial having been awarded, he was again placed upon trial and convicted of murder in the second degree; from which judgment of conviction he appeals to this court.

There are a number of errors assigned, and reasons urged why the judgment should be reversed; but we deem it unnecessary to consider them all. A proper solution of three points raised by the record, and assigned as error by the defendant, will be all that is required for a correct disposition of this case.

1. Was there error in the charge of the court upon the subject of manslaughter?

2. Did the court err in refusing to give the instructions asked by the defendant, bearing upon the right of self-defense in connection with the conspiracy between deceased and one Freeland?

3. Did the court err in not rejecting evidence of express malice,—the defendant being on trial for murder in the second degree?

1st. On manslaughter, the court below charged the jury:

"Manslaughter is voluntary homicide, committed under the immediate influence of sudden passion, arising from an adequate cause, but neither excused or justified by law. You will see that, to reduce a killing from murder to manslaughter, the mind of the slayer must be under the influence of a sudden passion, arising at the time of the killing, aroused by a present provocation and not the result of a former provocation. It is not enough that the mind is merely agitated by passion arising from a former provocation. The passion must have been aroused by an adequate cause, and the cause must be sufficient to produce a degree of anger, rage, resentment or terror, in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. Insulting words or gestures, or an assault and battery so slight as to show no intention to inflict pain or injury, are not deemed adequate causes to reduce a killing from murder to manslaughter."

The only other reference to the subject of manslaughter, except when mentioned in connection with the definition of murder in the second degree, is as follows:

"If you find from the testimony that the defendant did so shoot and kill the said Driscoll at Montague county, at any time within three years before the 23d day of June, 1879, and if there is in your mind a reasonable

doubt as to whether said killing was with malice afore-thought or not, then you will acquit defendant of the charge of murder.    But if you find that said killing was not in his, defendant's, own proper self-defense, as here-inbefore defined, then you will find defendant guilty of manslaughter."

The evidence being of such a character as to require a charge upon manslaughter, the question presents itself: is the above charge such as the law requires?  The counsel for defense objects, and we think justly, to this charge: 1st, upon the ground that it is negative in its nature and effect; 2d, that, though it is true that insulting words or gestures, or an assault and battery so slight as to show no intention to inflict pain or injury, are not deemed ade-quate causes to reduce a killing from murder to man-slaughter, yet, this being true as an abstract proposition of law, the facts of this case do not justify the court below in stopping with the enunciation of this principle.

We search in vain to discover in this charge an affirm-ative, direct and pertinent application of the law of manslaughter to the facts of the case.  Though the charge contains correct abstract propositions of the law of man-slaughter, there is not the slightest attempt to apply affirmatively these principles to the evidence.   Man-slaughter is a defense to murder, as well as self-defense,— the former partial, while the latter is complete.  The rule applicable to all defenses, whether complete or otherwise, is that the court below must apply the law clearly, perti-nently, and *affirmatively* to the facts tending to support the defense.  *Johnson* v. *State*, 43 Texas, 612.

The charge presenting manslaughter negatively, the impression is natural that, in the opinion of the judge presiding, the evidence fails to support this degree of hom-icide.   The effect of such a charge is to impress upon the minds of the jury that the presiding judge has but little if any confidence in the evidence tending to support man-

slaughter. If the evidence made it necessary to charge upon manslaughter,— and we think it did,— the law should have been given to the jury affirmatively, and not burdened — freighted down — with negatives. And as Judge Ireland, in *Johnson* v. *State,* above cited, very properly suggests: " After giving the law as was done in this case, the judge should have given a distinct, independent charge on manslaughter, telling the jury in a proper form that if they find from the testimony that the circumstances did exist which would reduce the offense to manslaughter, they could only find him guilty of that offense." *Johnson* v. *State,* 43 Texas, 612.

The second objection to the charge on manslaughter is that, whilst it is true that insulting words or gestures, or an assault and battery so slight as to show no intention to *inflict pain* or *injury,* are not adequate causes, the evidence presents no such restricted issue. As a legal proposition this is correct, but these legal propositions given abstractly will not suffice. They must be applied by the court to the facts, directly, clearly, and affirmatively. Suppose there are other facts to support the theory of manslaughter besides insulting words or an assault and battery so slight as to show no intention to inflict pain or injury, would it be proper for the court to call special attention to the insufficiency of the insulting words and assault and battery, and remain silent as the grave upon the other facts? We think not. This would be giving undue prominence to a legal fact hostile to the defense, after first separating it from its immediate neighbors, the other facts which tend to support the defense. If proper to inform the jury of the *facts* which will not reduce, certainly it was the duty of the court to instruct them as to *those* which would reduce the offense to manslaughter.

But again, suppose the assault and battery was so slight as to show no intent to inflict pain or injury, viewed

separate and independent of the facts which surrounded it, yet when viewed in the light of the surrounding facts — taking the assault and battery with all of the other facts,— not only an intent to inflict pain or injury, but a deadly intent, appears, would it be proper or just to the defendant for the court to single out the facts which would not be sufficient to reduce the offense and remain silent in regard to those which would? Most clearly not.

We are not to be understood as holding that defendant is not guilty of murder or that he is guilty of manslaughter. We are treating of the charge of the court, and not the guilt or innocence of the defendant. Every theory presented by evidence in the case demands of the court a charge thereon, whether strongly or weakly supported by the testimony. If there be evidence tending to support it, the law must be directly and pertinently applied thereto. The jury, and the jury alone, must pass upon the strength of the evidence which tends to support the theory. Nor can the evidence be so full and complete in favor of one theory, as to preclude evidence, or excuse the court in refusing or failing to charge the law, relative to another theory.

The statement of facts tends to establish a conspiracy between deceased and one Freeland. Freeland was present, armed, and there is evidence tending to show that he fired at if he did not shoot the defendant. Under this state of facts, the counsel for defendant asked these instructions:

"If you believe from the evidence that a conspiracy was entered into between Driscoll (the deceased) and Freeland, to kill the defendant, and that defendant was stopped by Driscoll, and that it was the intention of Driscoll and Freeland, or either of them, to kill the defendant, and that they were then about to execute said conspiracy, you will find the defendant not guilty."

By reference to the charge of the court upon the subject of self-defense it will be seen that the defendant's

right to defend himself is made to depend upon the acts or demonstrations of Driscoll alone.  This is the case connected or disconnected with threats.  Here the charge of the court did not apply the law applicable to all of the facts of the case, for if there was a conspiracy between Driscoll and Freeland to take the life of the defendant, and Freeland was present, any act on his part showing an intention to consummate the conspiracy would have justified defendant in acting in his own protection.  And if it reasonably appeared to him by all of the surrounding facts that Driscoll and Freeland were there acting together, he had the right to take the life of either.  Whether the charge asked was precisely correct or not, the facts were of such a character that this rejected charge sufficiently called the attention of the court to the subject, and, if not correct, the proper charge should have been given upon that phase of the case.  We are of the opinion that, whether asked or not, it was the duty of the court to have charged the law applicable to this state of facts.  Nor was it necessary to show that the defendant knew of the conspiracy.  If the evidence shows the conspiracy (and of this there is no doubt), and that Freeland was present, the defendant may have known of it, or he may have seen the conduct of Freeland, as did the witnesses who were present.  This was a matter for the jury.  If they believed from the evidence that defendant knew nothing of the conspiracy, nor see any act of Freeland showing the conspiracy, and the intention then to carry into execution the conspiracy to take the life of the defendant, of course the fact of conspiracy would have no bearing upon the case.  This fact could have been presented to the jury along with the charge upon that subject.

The third question, and the last which we will consider, is the action of the court in receiving evidence of express malice, over the objection of defendant.  The defend-

ant having been acquitted of murder of the first degree by a verdict of murder of the second degree, and being placed upon trial again for murder of the second degree, the defendant objected to all evidence tending to show express malice. This objection we think was not well taken. The difference between express and implied malice is that the former must be shown by evidence, nor can it (express malice) be inferred from the killing alone; while the latter is presumed from the killing with a deadly weapon if not attended with circumstances which reduce to manslaughter, or which excuse or justify the killing. It is logically impossible to prove express malice without proving malice, and if the killing be upon malice the offense is murder. In order, however, to convict of murder in the first degree, the malice must be affirmatively shown by the evidence.

Again, under an indictment for murder of the second degree, issues are formed upon manslaughter and justifiable or excusable homicide. Evidence, therefore, of express malice is evidently admissible upon those issues. For if the killing be upon express malice, the offense cannot be manslaughter or justifiable homicide. The court did not err in overruling the objection to the admissibility of this character of evidence.

For the errors of the court above indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*